**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES -- GENERAL**

| | |
|---|---|
| Case No. **CV 18-3249-JFW(SSx)** | Date: May 24, 2019 |

Title: M.J.L.H., et al. -v- City of Pasadena, et al.

---

**PRESENT:**
**HONORABLE JOHN F. WALTER, UNITED STATES DISTRICT JUDGE**

| Shannon Reilly | None Present |
|---|---|
| Courtroom Deputy | Court Reporter |

| ATTORNEYS PRESENT FOR PLAINTIFFS: | ATTORNEYS PRESENT FOR DEFENDANTS: |
|---|---|
| None | None |

**PROCEEDINGS (IN CHAMBERS):**     **ORDER GRANTING IN PART DEFENDANT BRADEN'S MOTION FOR SUMMARY JUDGMENT [filed 4/22/19; Docket No. 58];**

**ORDER GRANTING IN PART DEFENDANTS CITY OF PASADENA, MACLAURIN ADESINA, AND WILLIAM BROGHAMER'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, SUMMARY ADJUDICATION [filed 4/22/19; Docket No. 61]; and**

**ORDER GRANTING IN PART DEFENDANTS CITY OF GLENDALE AND OFFICER JUSTIN DARBY'S MOTION FOR SUMMARY JUDGMENT OR ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT [filed 4/22/19; Docket No. 63]**

      On April 22, 2019, Defendant Willie Braden ("Braden") filed a Motion for Summary Judgment. On April 29, 2019, Plaintiffs M.J.L.H. ("M.J.L.H."), a minor, by and through his guardian ad litem, Chelsie Hall, individually and as heir at law and successor in interest to Matthew Hurtado ("Decedent"), Jose Hurtado ("Hurtado"), Lillian Bennett ("Bennett"), and Nicole Strohm ("Strohm") (collectively, "Plaintiffs") filed their Opposition. On May 6, 2019, Braden filed a Reply. On April 22, 2019, Defendants City of Pasadena ("Pasadena"), Maclaurin Adesina ("Adesina"), and William Broghamer ("Broghamer") (collectively, "Pasadena Defendants") filed a Motion for Summary Judgment, or in the Alternative, Summary Adjudication ("Motion for Summary Judgment"). On April 29, 2019, Plaintiffs filed their Opposition. On May 6, 2019, the Pasadena Defendants filed a Reply. On April 22, 2019, Defendants City of Glendale ("Glendale"), and Justin Darby ("Darby") (collectively, "Glendale Defendants") filed a Motion for Summary Judgment or Alternatively, Partial

Summary Judgment ("Motion for Summary Judgment"). On April 29, 2019, Plaintiffs filed an Opposition. On May 6, 2019, the Glendale Defendants filed a Reply. Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the Court found these matters appropriate for submission on the papers without oral argument. The matters were, therefore, removed from the Court's May 20, 2019 hearing calendar and the parties were given advance notice. After considering the moving, opposing, and reply papers, and the arguments therein, the Court rules as follows:

I.    **Factual and Procedural Background**[1]

    A.    **Factual Background**

This case involves a fatal officer-involved shooting of Decedent, an attempted murder suspect, at Encanto Park in the City of Duarte by members of the United States Marshal's Fugitive Apprehension Task Force ("FAU").[2] On October 5, 2017 at approximately 10:30 p.m., Pasadena Police officers responded to several 911 calls involving the shooting of two teenage victims in a residential neighborhood in the City of Pasadena. The suspect had fled before the police arrived. However, the two teenage victims survived and one of the victims identified the shooter as "Creeper" from "VPR,"[3] a criminal street gang located in Pasadena. Detective Jose Urita, one the detectives with the Pasadena Police Department investigating the incident, knew that "Creeper" was Decedent's nickname.

On the morning of October 6, 2017, Pasadena Police detectives requested the assistance of FAU to apprehend Decedent. FAU officers were informed of Decedent's background, including the fact that he had been identified as the shooter in the attempted murder of two teenagers; had previously been arrested for carjacking, robbery, assault with a deadly weapon, and battery with serious bodily injury; was on parole; was a member of VPR; and was believed to be armed with one and possibly two semi-automatic pistols. FAU officers were also provided with a photograph of Decedent. Based on the real time GPS coordinates from Decedent's cellphone, the FAU officers began tracking Decedent. FAU officers initially located Decedent in Upland, where he was observed driving a white Toyota Camry with paper plates. The officers following Decedent lost sight of Decedent's car, but based on the GPS coordinates from Decedent's cellphone, the FAU officers were able to determine that Decedent was in Encanto Park in the City of Duarte. The FAU officers went to Encanto Park and, at approximately 12:00 p.m., Decedent was observed by Broghamer walking in the park with a woman, later identified as Strohm. Darby observed the white

---

    [1] The facts in this case are largely undisputed. To the extent that the Court has relied on evidence to which the parties have objected, the Court has considered and overruled those objections. As to the remaining objections, the Court finds that it is unnecessary to rule on those objections because the disputed evidence was not relied on by the Court.

    [2] The U.S. Marshals Fugitive Apprehension Unit is comprised of law enforcement personnel from the U.S. Marshals Service, the Glendale Police Department, the Pasadena Police Department, and the California Department of Corrections and Rehabilitation. Adesina, Broghamer, Darby, and Braden (collectively, the "Individual Defendants") are members of the FAU.

    [3] "VPR" is an abbreviation for Varrio Pasadena Rifa.

Camry that Decedent had been driving in the parking lot of Encanto Park. Because there were children in the park, the FAU officers decided that the safest way to arrest Decedent would be to wait until he entered his car. Decedent's car was parked perpendicular to the curb and in front of bushes. After Decedent entered his car, the FAU officers planned to surround Decedent's car with their undercover vehicles to prevent Decedent from leaving the parking space.

At approximately 1:00 p.m., shortly after Decedent entered his car, the FAU officers approached Decedent's car in their undercover vehicles with lights and sirens activated and positioned their vehicles so that Decedent's car would be unable to move from his parking space. Darby positioned his vehicle directly behind Decedent's car. Broghamer and Braden positioned their vehicles on the driver's side of Decedent's car. U.S. Marshal Toby Green and Adesina positioned their vehicles on the passenger's side of Decedent's car. The FAU officers wore vests with the word "POLICE" on the front, identified themselves as "police," and yelled repeatedly at Decedent to "put your hands up" and "let me see your hands."

Instead of complying with the officers' commands, Decedent immediately attempted to drive out of the parking space. With his engine revving at full throttle and his tires squealing and smoking from burning rubber, Decedent drove his car backwards and forward in an attempt to escape.[4] Mark Groessl ("Groessl"), a witness who had been doing a crossword puzzle and listening to the radio while sitting nearby in his car, observed Decedent driving back and forth and believed Decedent was "trying like hell to get out of there." Groessl observed Decedent's car hit Darby's car at least three times with enough speed and force that smoke was coming from the tires of his car and Decedent's car appeared to be bouncing off of Darby's car. Groessl also testified that Decedent definitely refused to comply with the officers' commands to show them his hands. According to Darby, when Decedent drove backwards, he rammed into Darby's vehicle, which was parked directly behind Decedent's car, and because Darby was standing behind his driver's side door, Darby was struck by his car and pushed backwards each time Decedent hit Darby's car. When Decedent drove forward, the FAU officers observed Decedent's car go over the curb. Darby feared that Decedent's car would jump the curb and that he would drive through the bushes into the area occupied by Officer Max Sievers ("Sievers"). As a result of his concerns for the safety of Sievers, Darby yelled to Sievers to run. During his attempt to escape, Decedent was observed reaching toward the middle console area and several officers concluded Decedent was reaching for a gun.[5] Based on the threat posed by Decedent's attempts to escape, the use his car as a weapon, and the officers' conclusion that Decedent was reaching for a gun, officers fired their weapons at Decedent. Groessl heard the FAU officers yelling "he's reaching, he's reaching" immediately before shots were fired. Adesina fired eight rounds, Broghamer fired six rounds, Darby fired four rounds, and Braden fired four rounds. Immediately before he started shooting, Darby saw the reverse taillight go on and Decedent's car start moving toward him again. Darby

---

[4] Decedent's car contained an Event Data Recorder ("EDR") that documented part of his vehicle's movement during his attempted escape. The EDR showed that Decedent shifted his car into drive and drove forward at full throttle. The EDR also showed that Decedent then immediately shifted his car into reverse and drove at full throttle.

[5] A semi-automatic pistol matching the attempted murder weapon used by Decedent the night before was recovered on the rear passenger side floorboard in Decedent's car. Plaintiffs speculate that Decedent was not reaching for the semi-automatic pistol but was shifting gears.

was fearful that if Decedent continued to drive towards him, he would successfully escape and in the process he and other officers would be seriously injured by Decedent. The Individual Defendants stopped firing as soon as Decedent's car stopped. The Individual Defendants estimate that the entire encounter lasted between 10 and 30 seconds from the time the FAU officers' vehicles converged on Decedent's car until the time of the shooting.[6]

After the shooting, Broghamer and Braden approached Decedent's car with the protection of a ballistic shield and saw that Decedent's hands were empty and in his lap and he appeared unconscious. Broghamer removed Decedent from his car and several of the FAU officers immediately began rendering medical aid. FAU Officer Timothy Ohno ("Ohno") called for paramedics within five minutes of the shooting. Paramedics arrived and Decedent, who had been shot four times, was airlifted to the hospital, where he died of his injuries. Strohm, who was in the car with Decedent but not the object of the use of force, sustained gunshot wounds to her left foot and arm.

### B. Procedural Background

On April 28, 2018, Plaintiffs filed a Complaint. On August 23, 2018, Plaintiffs filed their First Amended Complaint against Pasadena, Glendale, State of California Department of Corrections & Rehabilitation[7], Adesina, Broghamer, Darby, and Braden, alleging claims for relief for: (1) violation of civil rights under color of law (Fourth and Fourteenth Amendment) pursuant to 42 U.S.C. § 1983) by M.J.L.H. and Strohm against the Individual Defendants; (2) violation of substantive due process rights (Fourteenth Amendment) pursuant to 42 U.S.C. § 1983 by M.J.L.H., Hurtado, and Bennett against the Individual Defendants; (3) municipal liability for violation of constitutional rights by Plaintiffs against Pasadena and Glendale[8]; (4) assault and battery and wrongful death by

---

[6] Groessl testified that it was "seconds" between the time Decedent slammed into Darby's undercover vehicle and an FAU officer yelled "he's reaching, he's reaching." Groessl Deposition, 40:5-41:3. Groessl's statements on the cellphone video that he recorded at Encanto Park immediately after the shooting and his testimony during his deposition regarding the incident are consistent and are also consistent with the FAU officers' testimony regarding the incident. Strohm, who was traumatized by the incident, gave deposition testimony that although was lacking in detail, was generally consistent with the testimony of Groessl and the FAU officers. For example, Strohm also testified that approximately 10 to 30 seconds elapsed from the time she and Decedent entered the car until the time of the shooting. Strohm Deposition, 65:17-20. Strohm also testified that Decedent "tried to reverse [his car] back" because Decedent was trying "to move [his car] off the curb." *Id.* at 60:5-7 and 61:4-5. Strohm also testified that she heard the FAU officers saying "he's reaching" as they began shooting and that Decedent's hands were near the ignition and the radio, and not raised, at that time. *Id.* at 65:2-12.

[7] The State of California Department of Corrections & Rehabilitation was dismissed by Plaintiffs pursuant to Rule 41 on October 2, 2018.

[8] During the April 10, 2019 Local Rule 7-3 meet and confer conference, Plaintiffs agreed to dismiss their third claim for relief for municipal liability against Pasadena and Glendale. *See* Declaration of Humberto Guizar, Re Rule 7-3 Conference on Contemplated Summary Judgment Motions (Docket No. 57). Accordingly, Plaintiffs' third claim for relief for municipal liability against

Plaintiffs against the Individual Defendants; and (5) negligence by Plaintiffs against Pasadena, Glendale, and the Individual Defendants.

## II. Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party meets its burden, a party opposing a properly made and supported motion for summary judgment may not rest upon mere denials but must set out specific facts showing a genuine issue for trial. *Id.* at 250; Fed. R. Civ. P. 56(c), (e); *see also Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) ("A summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data."). In particular, when the non-moving party bears the burden of proving an element essential to its case, that party must make a showing sufficient to establish a genuine issue of material fact with respect to the existence of that element or be subject to summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "An issue of fact is not enough to defeat summary judgment; there must be a genuine issue of material fact, a dispute capable of affecting the outcome of the case." *American International Group, Inc. v. American International Bank*, 926 F.2d 829, 833 (9th Cir. 1991) (Kozinski, dissenting).

An issue is genuine if evidence is produced that would allow a rational trier of fact to reach a verdict in favor of the non-moving party. *Anderson*, 477 U.S. at 248. "This requires evidence, not speculation." *Meade v. Cedarapids, Inc.*, 164 F.3d 1218, 1225 (9th Cir. 1999). The Court must assume the truth of direct evidence set forth by the opposing party. *See Hanon v. Dataproducts Corp.*, 976 F.2d 497, 507 (9th Cir. 1992). However, where circumstantial evidence is presented, the Court may consider the plausibility and reasonableness of inferences arising therefrom. *See Anderson*, 477 U.S. at 249-50; *TW Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 631-32 (9th Cir. 1987). Although the party opposing summary judgment is entitled to the benefit of all reasonable inferences, "inferences cannot be drawn from thin air; they must be based on evidence which, if believed, would be sufficient to support a judgment for the nonmoving party." *American International Group*, 926 F.2d at 836-37. In that regard, "a mere 'scintilla' of evidence will not be sufficient to defeat a properly supported motion for summary judgment; rather, the nonmoving party must introduce some 'significant probative evidence tending to support the complaint.'" *Summers v. Teichert & Son, Inc.*, 127 F.3d 1150, 1152 (9th Cir. 1997).

## III. Discussion

In their respective Motions for Summary Judgment, the Glendale Defendants, the Pasadena Defendants, and Braden each seek judgment on the four remaining claims for relief alleged by Plaintiffs in the First Amended Complaint.[9]

---

Pasadena and Glendale is **DISMISSED without prejudice**.

[9] The Individual Defendants also moved for summary judgment on Plaintiffs' denial/delay of medical care claim alleged in the first and second claims for relief. However, Plaintiffs failed to address that claim in their Oppositions and, thus, Plaintiffs have conceded that claim. *See, e.g.,*

### A. The Legal Standard for Section 1983 Claims

In the first and second claims for relief, Plaintiffs allege violations of Section 1983. It is well established that Section 1983 itself creates no substantive rights, and that it merely provides a remedy for deprivation of federal rights established elsewhere. *City of Oklahoma City v. Tuttle*, 471 U.S. 808 (1985). "The elements of a section 1983 action are: (1) that the conduct complained of was committed by a person acting under color of state law; and (2) that the conduct deprived a person of rights, privileges or immunities secured by the Constitution or laws of the United States." *Alford v. Haner*, 333 F.3d 972, 975-76 (9th Cir. 2003) (citation and internal quotation marks omitted). With respect to the first element, it is undisputed that the Individual Defendants were acting under color of state law. With respect to the second element, in the first claim for relief, Plaintiffs allege that the Individual Defendants used excessive force and violated Decedent's Fourth and Fourteenth Amendment rights by shooting and killing him and that the Individual Defendants used excessive force and violated Strohm's Fourth and Fourteenth Amendment rights by shooting and injuring her.[10] In the second claim for relief, Plaintiffs allege that the Individual Defendants violated M.J.L.H.'s, Hurtado's, and Bennett's Fourteenth Amendment rights to familial association by shooting and killing Decedent.

### 1. Legal Standard for Qualified Immunity.

---

*Cruz-Sanchez v. National Railroad Passenger Corp.*, 2018 WL 6017034 (C.D. Cal. June 8, 2018) (granting Amtrak's motion for summary judgment with respect to premises liability where "Plaintiff offers no arguments as to why Amtrak may be liable on a premises liability theory" and holding that "Plaintiff's failure to respond to it warrants granting the Amtrak Motion as to the premises liability claim"); *see also Walsh v. Nevada Dept. of Human Resources*, 471 F.3d 1033, 1037 (9th Cir. 2006) (holding that plaintiff who failed to address issues raised in a defendant's motion to dismiss in his opposition brief "has effectively abandoned his claim, and cannot raise it on appeal"); *Silva v. U.S. Bancorp*, 2011 WL 7096576, at *4 (C.D. Cal. Oct. 6, 2011) ("[T]he Court finds that Plaintiff concedes his . . . claim should be dismissed because he failed to address Defendants' arguments in his Opposition."); *Conservation Force v. Salazar*, 677 F. Supp. 2d 1203, 1211 (N.D. Cal. 2009) ("Where plaintiffs fail to provide a defense for a claim in opposition, the claim is deemed waived") (*citing Locricchio v. Office of U.S. Trustee*, 313 Fed. Appx. 51, 52 (9th Cir. 2009)). Accordingly, the Individual Defendants are entitled to summary judgment with respect to Plaintiffs' denial/delay of medical care claim.

[10] Although Plaintiffs refer to both the Fourth and Fourteenth Amendments in their first claim for relief, nowhere, either in the First Amended Complaint or in their Oppositions, do Plaintiffs articulate a theory or provide any legal argument supporting a Fourteenth Amendment substantive due process claim on behalf of Decedent. To the extent Plaintiffs intended to allege a substantive due process claim, it fails for the same reasons as Decedent's Fourth Amendment claim. In addition, Plaintiffs fail to address whether Strohm's excessive force claim should be analyzed under the Fourth or Fourteenth Amendment. For the reasons discussed below, the Court agrees with the Individual Defendants that Strohm's excessive force claim should be analyzed under the Fourteenth Amendment. However, to the extent Strohm's excessive force claim should be analyzed under the Fourth Amendment, it fails for the same reasons as Decedent's Fourth Amendment claim.

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Messerschmidt v. Millender*, 132 S.Ct. 1235 (2012) (holding that "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law") (internal quotations omitted). In *Saucier v. Katz*, the Supreme Court established a two-step sequence for determining whether qualified immunity attaches to specific circumstances. *See Saucier v. Katz*, 533 U.S. 194 (2001). First, the Court must determine based on the facts "[t]aken in the light most favorable to the party asserting the injury," whether "the officer's conduct violated a constitutional right." *Id.* at 201. Second, if the plaintiff satisfies this first step, the Court must then decide whether the right at issue was "clearly established" at the time of the alleged misconduct. *Id.*

Although the determination of qualified immunity requires a two-step analysis, as the Ninth Circuit has held that "[t]hese two prongs of the analysis need not be considered in any particular order, and both prongs must be satisfied for a plaintiff to overcome a qualified immunity defense. *Shafer v. County of Santa Barbara*, 868 F.3d 1110 (9th Cir. 2017) (*citing Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 201. This is an "objective but fact-specific inquiry." *Inouye v. Kemna*, 504 F.3d 705, 712 (9th Cir. 2007). "I[f] officers of reasonable competence could disagree on [the] issue, immunity should be recognized." *Fogel v. Collins*, 531 F.3d 824, 833 (9th Cir. 2008) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "It is the plaintiff who bears the burden of showing that the rights allegedly violated were 'clearly established.'" *Shafer*, 868 F.3d 1110 (internal citation omitted).

### 2. Whether a Right is Clearly Established is a Particularized Inquiry.

In the recent case of *City of Escondido, California v. Emmons*, __U.S. __, 139 S.Ct. 500, 503 (2019), the Supreme Court once again emphasized that:

Under our cases, the clearly established right must be defined with specificity. "This Court has repeatedly told courts . . . not to define clearly established law at a high level of generality." *Kisela*, 584 U.S., at ___, 138 S.Ct., at 1152 (internal quotation marks omitted). That is particularly important in excessive force cases, as we have explained:

> "Specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue . . .
>
> "[I]t does not suffice for a court simply to state that an officer may not

use unreasonable and excessive force, deny qualified immunity, and then remit the case for a trial on the question of reasonableness. An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Id.*, at ___, 138 S.Ct., at 1153 (quotation altered).

Similarly, in the case of *White v. Pauly*, ___ U.S. ___, 137 S.Ct. 548, 552 (2017) (per curiam), the Supreme Court held that "it is again necessary to reiterate the longstanding principle that 'clearly established law' should not be defined 'at a high level of generality.'" Moreover, the Supreme Court held that "[a]s this Court explained decades ago, the clearly established law must be 'particularized' to the facts of the case." *Id.* Indeed, the Supreme Court has "repeatedly told courts – and the Ninth Circuit in particular – not to define clearly established law at a high level of generality," *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (citation omitted), but to consider "whether the violative nature of particular conduct is clearly established." *Id.* at 742; *see also Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam) (holding that the relevant inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition") (quotation marks omitted). Although the law "do[es] not require a case directly on point, . . . existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741; *see also Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015) (per curiam) ("Put simply, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law") (quotation marks omitted); *Saucier,* 533 U.S. at 202 ("If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate"); *see also Wilkins v. City of Oakland*, 350 F.3d 949, 955 (9th Cir. 2003) (In performing the second step of the *Saucier* analysis, the Court must consider the "the reasonableness of the officer's belief in the *legality* of his actions. Even if his actions did violate the Fourth Amendment, a reasonable but mistaken belief that his conduct was lawful would result in the grant of qualified immunity.").

In addition, the Ninth Circuit recently explained in *Sharp v. County of Orange*, 871 F.3d 901 (9th Cir. 2017), the importance of specificity in the Fourth Amendment context:

Except in the rare case of an "obvious" instance of constitutional misconduct (which is not presented here), Plaintiffs must "*identify a case* where an officer acting under similar circumstances as [defendants] was held to have violated the Fourth Amendment." *White v. Pauly*, —— U.S. ——, 137 S.Ct. 548, 552 (2017) (per curiam) (emphasis added). In other words, Plaintiffs must point to prior case law that articulates a constitutional rule specific enough to alert *these* deputies *in this case* that *their particular conduct* was unlawful. To achieve that kind of notice, the prior precedent must be "controlling" – from the Ninth Circuit or Supreme Court – or otherwise be embraced by a "consensus" of courts outside the relevant jurisdiction. *Wilson v. Layne*, 526 U.S. 603, 617, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999).

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Under the Fourth Amendment, police may use only such force in the course of detention or arrest as is objectively reasonable under the circumstances, and may use deadly force only in response to a threat of

deadly force to either the police officer or to others. *See Graham v. Connor*, 490 U.S. 386, 394-395 (1989); *see, also Long v. City and County of Honolulu*, 511 F.3d 901, 906 (9th Cir. 2007) (using standard set forth in *Graham* to affirm granting of summary judgment in Fourth Amendment deadly force case). "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. This determination "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

Determining whether a police officer's use of force was reasonable or excessive requires balancing the "nature and quality of the intrusion " on a person's individual liberty with the "countervailing governmental interests at stake." *Id.* at 396; *see also Headwaters Forest Defense v. County of Humboldt*, 276 F.3d 1125, 1130 (9th Cir. 2002) ("'The essence of the *Graham* objective reasonableness analysis' is that '[t]he force which [i]s applied must be balanced against he need for that force: it is the need for force which is at the heart of the *Graham* factors.'") (quoting *Liston v. County of Riverside*, 120 F.3d 965, 976 (9th Cir. 1997)). This includes balancing such factors as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. The question is not whether other or lessor amounts of force could have been used, but only whether the force actually used was reasonable under the circumstances. *Forrester v. City of San Diego*, 25 F.3d 804, 807 (9th Cir. 1994).

### B. The First Claim for Relief for Violation of the First and Fourteenth Amendments

#### 1. Decedent's Excessive Force Claim

In their Motions for Summary Judgment, the Individual Defendants argue that the force used on Decedent was necessary and objectively reasonable under the totality of the circumstances. Specifically, the Individual Defendants argue that Decedent was wanted for the attempted murder of two teenagers on the previous night, had an extensive criminal history that included several violent crimes, was a VPR gang member, was believed to be in possession of firearms, and when surrounded by the FAU officers, refused to comply with their commands and instead attempted to escape by crashing into them. When his attempts to escape failed, the officers observed him reaching for what they reasonably concluded was a weapon. The Individual Defendants also argue that even if the force used could be considered excessive, the Individual Defendants are entitled to qualified immunity because reasonable officers in the Individual Defendants' position would not have known that their actions violated a clearly established right.

##### a. The Individual Defendants did not violate Decedent's Fourth Amendment rights.

When viewed in the light most favorable to Plaintiffs, the evidence in this case establishes that the Individual Defendants had probable cause to believe that Decedent posed immediate threat of seriously bodily injury or death to themselves, their fellow officers, and the public. *Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985) ("Where the officer has probable cause to believe

that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given"). The undisputed facts demonstrate that the FAU officers knew that they would be arresting Decedent, who was wanted for attempted murder, that he had an extensive criminal history that included violent crimes, was a VPR gang member, and was believed to be armed and dangerous. After the FAU officers identified Decedent walking in Encanto Park, they waited until he returned to his parked car to approach him with lights and sirens activated, positioned their vehicles to prevent his escape, identified themselves as "police," and yelled at Decedent to "put your hands up" and "let me see your hands." Decedent refused to comply with the FAU officers' lawful commands. In addition, Decedent immediately attempted to escape by violently ramming his car into the officer's vehicle parked behind him and attempting to jump the curb in front of him. Several of the FAU officers also saw Decedent reaching into the middle console to obtain what they believed was a gun. In fact, Groessl, the independent witness, heard the FAU officers yelling "he's reaching, he's reaching" immediately before shots were fired. Based on Decedent's refusal to comply with the officers' commands, his efforts to use his car as a deadly weapon, his attempts to escape from the officers, and convinced that he was arming himself with a gun, the Individual Defendants, who had to make a split second decision during this quickly evolving and volatile incident, reasonably believed that Decedent intended to evade arrest and flee from the officers, which posed an immediate threat to the FAU officers and others in the park and on the road. *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010)("The 'most important' factor under Graham is whether the suspect posed an immediate threat to the safety of the officers or others."); *see also Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011); *Brosseau v. Haugen*, 543 U.S. 194, 197-98 (2004).

      Indeed, an officer's use of deadly force is constitutional if the suspect threatens the officer with a weapon or "the officer has probable cause to believe that the suspect poses a significant threat of serious physical harm, either to the officer or to others." *Garner*, 471 U.S. at 11-12; *Hayes v. County of San Diego*, 736 F.3d 1223, 1234 (9th Cir. 2013). In addition, federal courts have recognized that a vehicle can be a deadly weapon. *U.S. v. Anchrum*, 594 F.3d 1162, 1164 (9th Cir. 2010); *Wilkinson v. Torres*, 610 F.3d 546 (9th Cir. 2010). The Supreme Court has repeatedly held that officers who use deadly force when faced with a threat of serious injury or death do not violate the Fourth Amendment, even if the threat is not specific or imminent. For example, the Supreme Court held in *Plumhoff* that officers did not violate the Fourth Amendment when they fired fifteen shots at a fleeing suspect even though a collision had brought the high-speed chase "temporarily to a near standstill." *Plumhoff v. Rickard*, 572 U.S. 765, 776-77 (2014). Although the threat to other drivers had arguably abated at the time of the shooting in *Plumhoff*, the Supreme Court held that the use of force was justified because "all that a reasonable police officer could have concluded was that Rickard was intent on resuming his flight and that, if he was allowed to do so, he would once again pose a deadly threat for others on the road." *Id.* at 766. Similarly, in *Scott*, the Supreme Court concluded that an officer's use of potentially lethal force was objectively reasonable because of "an actual and imminent threat to the lives of any pedestrians who might have been present, to other civilian motorists, and to the officers involved in the chase." *Scott v. Harris*, 550 U.S. 372, 384 (2007). The Supreme Court recognized an actual and imminent threat despite video evidence that "when Scott rammed respondent's vehicle it was

not threatening any other vehicles or pedestrians. (Undoubtedly Scott waited for the road to be clear before executing his maneuver.)." *Id.* at 380 n. 7.

Considered in light of *Scott* and *Plumhoff*, and bearing in mind "the broad discretion that must be afforded to police officers who face a tense situation" (*Jeffers v. Gomez*, 267 F.3d 895, 909 (9th Cir. 2001)), and that reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight" (*Graham*, 490 U.S. at 306), a reasonable officer in the Individual Defendants' position, who had to make life or death decisions in a tense, dangerous and rapidly changing environment, would have believed that Decedent posed an immediate threat of serious harm under the circumstances in this case in light of Decedent's erratic maneuvering of his vehicle and what the FAU officers perceived was his apparent reaching for a weapon. *Wilkinson*, 610 F.3d at 551 ("A reasonable use of deadly force encompasses a range of conduct, and the availability of a less-intrusive alternative will not render conduct unreasonable"); *Elliott v. Leavitt*, 99 F.3d 640, 644 (4th Cir. 1996) ("[T]he Fourth Amendment does not require omniscience . . . Officers need not be absolutely sure, however, of the nature of the threat or the suspect's intent to cause them harm – the Constitution does not require that certitude precede the act of self protection").

Therefore, viewing the facts in the light most favorable to Plaintiffs, the Court finds that the Individual Defendants did not violate Decedent's Fourth Amendment rights. Accordingly, the Individual Defendants are entitled to summary judgment on Decedent's Fourth Amendment claim.

### b. The Individual Defendants Did Not Violate Clearly Established Law.

Because the Court concludes that Decedent's Fourth Amendment rights were not violated by the Individual Defendants, the Court need not reach the second step of the *Saucier* analysis. *See, e.g., Johnson v. County of Los Angeles*, 340 F.3d 787, 793-94 (9th Cir. 2003). However, even assuming that the Court had found that the Individual Defendants' conduct constituted a constitutional violation, the Individual Defendants would still be entitled to summary judgment on Decedent's Fourth Amendment claim on the grounds of qualified immunity.

In this case, viewing the evidence in the light most favorable to Plaintiffs, the Court concludes that the Individual Defendants are entitled to qualified immunity because Plaintiffs have failed to demonstrate that it was clearly established that the Individual Defendants' use of force under these particular circumstances was a violation of Decedent's Fourth Amendment right. From the Individual Defendants' perspective and knowledge of the situation, which unfolded rapidly and required split second decision making, at the time they fired their weapons at Decedent, Decedent refused to surrender despite being surrounded by armed law enforcement officers attempting to conduct a lawful arrest of Decedent for attempted murder, failed to comply with the officers' commands to show his hands, attempted to escape by violently and dangerously ramming the surrounding police cars, and, based on the officers' belief, was reaching for a gun. Recent cases have found law enforcement officers entitled to qualified immunity in cases involving a less severe showing of aggression than those shown by Decedent. *See, e.g., Kisela v. Hughes*, ___ U.S. ___, 138 S. Ct. 1148, 1153-54 (2018) (holding that qualified immunity barred liability where officers shot a woman holding a knife, believing she was a threat to a woman standing near her); *Reese*, 888 F.3d at 1038 (holding that qualified immunity barred liability where an officer shot a suspect who

came to the door wielding a knife, backed away when fired upon and then stood in a position where the officer could not see his hands); *Isayeva v. Sacramento Sheriff's Dept.*, 872 F.3d 938, 950-52 (9th Cir. 2017) (holding that qualified immunity barred liability where an officer shot and killed a man he was trying to detain for a mental health evaluation after the man punched and pushed two officers); *S.B. v. County of San Diego*, 864 F.3d 1010, 1016-17 (9th Cir. 2017) (holding that qualified immunity barred liability where an officer shot an inebriated individual who carried knives). For example, in *Brosseau*, 543 U.S. at 197, the Supreme Court held that the officer was entitled to qualified immunity when she shot the suspect from behind as he was driving away to protect "other officers who [she] believed were in the immediate area" and "any other citizens who might be in the area. *Id.* Similarly, in P*lumhoff*, 572 U.S. at 780, the Supreme Court held that the officer was entitled to qualified immunity even though the driver "had just begun to flee and . . . had not yet driven his car in a dangerous manner." *Id.* Therefore, a reasonable law enforcement officer would not have known that shooting a suspect in this situation was unreasonable.

In addition, none of the cases cited by Plaintiffs are sufficiently similar to the facts of this case such that they would have alerted the Individual Defendants that their conduct was unlawful. The cases relied on by Plaintiffs largely involve situations in which a law enforcement officer was found to have used excessive force in shooting a compliant, unarmed man. For example, in *A.K.H. v. City of Tustin*, 837 F.3d 1005 (9th Cir. 2016), an officer shot an unarmed man who was reported to have stolen a cellphone from his girlfriend despite having been advised that the suspect was not violent and not armed. Similarly, in *Jefferson v. Lewis*, 594 F.3d 454 (6th Cir. 2009), an officer shot a person after he believed he saw a muzzle flash from a gun and thought a person in a doorway was firing on him, despite never having heard a gunshot. Thus, the cases cited by Plaintiffs are distinguishable and do not preclude qualified immunity.

The Court concludes that Plaintiffs have failed to carry their burden of demonstrating that the constitutional right at issue was clearly established such that a reasonable law enforcement officer would have known that his challenged conduct was unlawful. Based on the undisputed facts, which are taken in the light most favorable to Plaintiffs, a reasonable officer would not have known that firing their weapons at Decedent after he refused to surrender despite being surrounded by armed law enforcement officers, attempting to escape by recklessly and dangerously crashing into the officers' vehicles, and reaching for a gun would be unlawful at the time of the incident. Therefore, the Court concludes that, under the second step of the *Saucier* qualified immunity analysis, a reasonable officer in the Individual Defendants' position would not have known that the force used in this case violated a clearly established right.

Accordingly, the Individual Defendants' Motions for Summary Judgment are **GRANTED** with respect to Decedent's Fourth Amendment claim alleged in the first claim for relief.

### 2. Strohm's Excessive Force Claim

#### a. The Individual Defendants did not violate Strohm's Fourteenth Amendment rights.

In *Plumhoff*, 134 S. Ct. at 2021 n. 4, the Supreme Court recognized a circuit split "as to whether a passenger [in a shooting] . . . can recover under a Fourth Amendment theory," but

declined to express a view on the issue. Although the Ninth Circuit has yet to address this issue in a published decision, the Ninth Circuit did address the issue in the unpublished decision of *Arruda ex rel. Arruda v. County of Los Angeles*, 373 Fed. Appx. 798 (9th Cir. 2010). In *Arruda*, an officer accidentally struck a fellow officer with a stray bullet when the that officer was standing outside of the room where the shooting occurred. *Id.* at 799–800. Because the injured officer was not the "object" shot at by the officer, the Ninth Circuit held that there was no seizure under the Fourth Amendment. *Id.* The Ninth Circuit in *Arruda* cited to *Landol–Rivera v. Cruz Cosme*, 906 F.2d 791 (1st Cir. 1990), where an officer who shot at a car to protect a hostage and unintentionally hit the hostage and the First Circuit held that there was no seizure of the hostage under the Fourth Amendment. *Id.* at 794–96. In addition, in *Fletes v. City of San Diego*, 2015 WL 13326240 (S.D. Cal. Sep. 30, 2015), the district court applied *Arruda* and *Landol* in a case where officers shot at the driver of a car, fearing that he would run them over, and inadvertently hit the passenger. *Id.* at *2. In deciding a motion for summary judgment, the district court held that the passenger was not seized because the officer who knew the passenger was in the car only shot at the driver, and other two officers were unaware of the passenger's presence. *Id.* at *7. The Ninth Circuit subsequently affirmed the district court's decision in an unpublished opinion. *Fletes v. City of San Diego*, 687 Fed. Appx. 640 (9th Cir. 2017). Thus, the Court concludes, in light of *Arruda*, *Landol*, and *Fletes*, and the evidence that the Individual Defendants did not intentionally shoot at Strohm that Strohm was not seized under the Fourth Amendment. *See Arruda*, 373 Fed. Appx. At 799 ("[A] shooting victim struck by an officer's stray bullet is not seized because the victim was not the 'object' the officer intended to strike").

Although Strohm was not seized under the Fourth Amendment, the Supreme Court has held that where there has been no "seizure" under the Fourth Amendment, a claim may proceed under the more general contours of the Fourteenth Amendment. *See County of Sacramento v. Lewis*, 523 U.S. 833, 844 (1998) (holding that Fourth Amendment did not apply to high-speed police chase resulting in death of a motorcyclist because there was no "seizure," and, thus, the Fourth Amendment did not "cover" the claim, the plaintiff could sue under the Due Process Clause of the Fourteenth Amendment). A substantive due process claim requires the plaintiff to show that a state actor engaged in conduct that "shocks the conscience." *Lewis,* 523 U.S. at 846 (*citing Rochin v. California*, 342 U.S. 165, 172–173 (1952)); *see also Wilkinson*, 610 F.3d at 554 ("[W]here a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives"). In addition, the Ninth Circuit has found that "[r]eflexive conduct in situations demanding immediate law-enforcement response generally does not constitute conduct that is considered to 'shock the conscience' within the meaning of the Fourteenth Amendment jurisprudence." *Parker v. City of Pomona*, 67 Fed. Appx. 1001 (9th Cir. June 3, 2003). As the Supreme Court explained in *Lewis*, "when unforeseen circumstances demand an officer's instant judgment, even precipitate recklessness fails to inch close enough to harmful purpose to spark the shock that implicates 'the large concerns of the governors and the governed.' Just as a purpose to cause harm is needed for Eighth Amendment liability in a riot case, so it ought to be needed for Due Process liability in [a deadly force] case." *Lewis,* 523 U.S. at 853-54.

For example, in *Lewis*, a high-speed police chase of a motorcyclist led to the death of the passenger on the motorcycle. In deciding whether the police officer's actions shocked the conscience, the Court emphasized that it was necessary to analyze his conduct in the context of

the situation: "[Police officers] are suppose to act decisively and to show restraint at the same moment, and their decisions have to be made 'in haste, under pressure, and frequently without the luxury of a second chance.' A police officer deciding whether to give chase must balance on one hand the need to stop a suspect and show that flight from the law is no way to freedom, and, on the other, the high speed threat to all those within stopping range, be they suspects, their passengers, other drivers, or bystanders." *Id.* at 853 (*citing Graham*, 490 U.S. at 397 ("[P]olice officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving")); *see also Gonzalez v. City of Anaheim*, 747 F.3d 789, 797-98 (9th Cir. 2014) ("The plaintiffs produced no evidence that the officers had any ulterior motives for using force against Gonzalez, and the district court properly granted summary judgment on this claim").

The Court concluded that while the officer could have acted more prudently, the facts did not indicate that he acted "to terrorize, cause harm, or kill." *Lewis*, 523 U.S. at 855 ("Regardless whether [the officer's] behavior offended the reasonableness held by tort law or the balance struck in law enforcement's own codes of sound practice, it does not shock the conscience . . ."); *see, also, Moreland v. Las Vegas Metropolitan Police Department*, 159 F.3d 365, 373 (9th Cir. 1998) (recognizing that "the critical question in determining the appropriate standard of culpability is whether the circumstances allowed the state actors time to fully consider the potential consequences of their conduct," *citing Medeiros v. O'Connell*, 150 F.3d 164, 169-70 (2d Cir. 1998) (applying *Lewis* in an accidental shooting case), and *Radecki v. Barela*, 146 F.3d 1227, 1231-32 (10th Cir. 1998) (holding that *Lewis's* "'purpose to commit harm' standard applies to all cases involving 'emergency situations'")).

When viewed in the light most favorable to Plaintiffs, the undisputed facts in this case establish that Strohm's injuries were the direct result of the Individual Defendants' legitimate law enforcement objective and efforts and, therefore, the Individual Defendants' conduct does not shock the conscience. Accordingly, the Individual Defendants are entitled to summary judgment on Strohm's Fourteenth Amendment claim.

### b. The Individual Defendants did not violate clearly established law.

Because the Court concludes that Strohm's Fourteenth Amendment rights were not violated by the Individual Defendants, the Court need not reach the second step of the *Saucier* analysis. *See, e.g., Johnson v. County of Los Angeles*, 340 F.3d 787, 793-94 (9th Cir. 2003). However, even assuming that the Court had found that the Individual Defendants' conduct represented a constitutional violation, the Individual Defendants would still be entitled to summary judgment on Strohm's Fourteenth Amendment claim on the grounds of qualified immunity.

In this case, viewing the evidence in the light most favorable to Plaintiffs, the Court concludes that the Individual Defendants are entitled to qualified immunity because Plaintiffs have failed to demonstrate that it was clearly established that the Individual Defendants' use of force under these particular circumstances was a violation of Strohm's Fourteenth Amendment right. *See, e.g., Schwake v. Arizona Board of Regernts*, 2018 WL 1536388 (D. Ariz. March 29, 2018) (granting the defendants' motion to dismiss on qualified immunity where the plaintiff had failed to direct the district court to any case demonstrating that the constitutional right at issue was clearly established and that the contours of that right were sufficiently clear that the defendants would have understood that their behavior violated the plaintiff's right).

In addition, "[t]he concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct," and the Court finds that the Individual Defendants reasonably could have believed that their conduct was lawful under the circumstances. *Id.*; *see also Malley v. Briggs*, 475 U.S. 335, 341 (1986) (qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law").

Accordingly, the Individual Defendants' Motions for Summary Judgment are **GRANTED** with respect to Strohm's Fourth and Fourteenth Amendment claim alleged in the first claim for relief.

## C. The Second Claim for Relief for Violation of the Fourteenth Amendment

### 1. The Individual Defendants did not violate Plaintiffs' Fourteenth Amendment rights to Familial Association.

In *Porter,* the Ninth Circuit "clarif[ied] the standard of culpability" for Fourteenth Amendment due process right to familial association claims in a case brought by the parents of a motorist who was shot and killed by a state highway patrol officer during a suspicious vehicle investigation:

> The parties mistakenly suggest that the choice is between "shocks the conscience" and "deliberate indifference" as the governing standard, when in fact the latter is one subset of the former. The Supreme Court has made it clear, as the district court correctly recognized, that only official conduct that "shocks the conscience" is cognizable as a due process violation. *Lewis*, 523 U.S. at 846, 118 S.Ct. 1708 (*citing Rochin v. California*, 342 U.S. 165, 172-73, 72 S.Ct. 205, 96 L.Ed. 183 (1952)). The relevant question on the facts here is whether the shocks the conscience standard is met by showing that Trooper Osborn acted with deliberate indifference or requires a more demanding showing that he acted with a purpose to harm Casey for reasons unrelated to legitimate law enforcement objectives. *See id.* at 836, 118 S.Ct. 1708. In our cases following the Supreme Court's enunciation of the shocks the conscience test in *Lewis*, we have distinguished the "purpose to harm" standard from the "deliberate indifference" standard, recognizing that the overarching test under either is whether the officer's conduct "shocks the conscience." *See, e.g., Moreland*, 159 F.3d at 372.

*Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008) (finding that the plaintiffs would have to demonstrate that the officer acted with a purpose to harm their son "that was unrelated to legitimate law enforcement objectives" in reversing denial by district court of officer's qualified immunity summary judgment).

When viewed in the light most favorable to Plaintiffs, the evidence in this case establishes that Decedent's death was the result of legitimate law enforcement objectives, and, therefore, the Individual Defendants' conduct does not shock the conscience. Accordingly, the Individual Defendants are entitled to summary judgment on Plaintiffs' second claim for relief for violation of their Fourteenth Amendment rights to familial association.

### 2. The Individual Defendants did not violate clearly established law.

Because the Court concludes that Plaintiffs' Fourteenth Amendment rights to familial association were not violated by the Individual Defendants, the Court need not reach the second step of the *Saucier* analysis. *See, e.g., Johnson v. County of Los Angeles*, 340 F.3d 787, 793-94 (9th Cir. 2003). However, even assuming that the Court had found that the Individual Defendants' conduct represented a constitutional violation, the Individual Defendants would still be entitled to summary judgment on Plaintiffs' Fourteenth Amendment claim on the grounds of qualified immunity.

In this case, viewing the evidence in the light most favorable to Plaintiffs, the Court concludes that the Individual Defendants are entitled to qualified immunity because Plaintiffs have failed to demonstrate that it was clearly established that the Individual Defendants' use of force under these particular circumstances was a violation of Plaintiffs' Fourteenth Amendment rights.

In addition, "[t]he concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct," and the Court finds that the Individual Defendants reasonably could have believed that their conduct was lawful under the circumstances. *Id.*; *see also Malley v. Briggs*, 475 U.S. 335, 341 (1986) (qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law").

Accordingly, the Individual Defendants' Motions for Summary Judgment are **GRANTED** with respect to Plaintiffs' second claim for relief for violation of their Fourteenth Amendment rights to familial association.

### D.    Plaintiffs' State Law Claims Are Dismissed.

"The district court may decline to exercise supplemental jurisdiction over a claim . . . if the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c). "[A] federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendent state-law claims." *Carnegie–Mellon University v. Cohill,* 484 U.S. 343, 350 (1988). "'[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state law claims.'" *Satey v. JPMorgan Chase & Co.*, 521 F.3d 1087, 1091 (9th Cir. 2008) (quoting *Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 351 (1988)).

In light of the fact that the Court has granted summary judgment on the only claims over which this Court has original jurisdiction, and after considering judicial economy, convenience, fairness, and comity, the Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims. Indeed, although Plaintiffs' state and federal law claims are based on similar facts and theories, the state law claims cannot be easily or summarily disposed of based on the Court's ruling on the federal claims, especially because qualified immunity is not applicable to the state law claims. In addition, the state law claims have unique elements and involve complex issues, which are more appropriately resolved by the state court. "Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *United Mine Workers of Am. v. Gibbs*, 383 U.S.

715, 726 (1966). Accordingly, the balance of factors strongly favor declining to exercise jurisdiction over the remaining state law claims, and Plaintiffs' fourth claim for relief for assault and battery and wrongful death and fifth claim for relief for negligence are **DISMISSED without prejudice**.

IV.     Conclusion

For all the foregoing reasons, Braden's Motion for Summary Judgment, the Pasadena Defendants' Motion for Summary Judgment, and the Glendale Defendants' Motion for Summary Judgment are **GRANTED** with respect to Plaintiffs' first claim for relief for violation of the Fourth and Fourteenth Amendments and second claim for relief for violation of the Fourteenth Amendment. In addition, Plaintiffs' third claim for relief for municipal liability, fourth claim for relief for assault and battery and wrongful death, and fifth claim for relief for negligence are **DISMISSED without prejudice**.

The parties are ordered to meet and confer and agree on a joint proposed Judgment which is consistent with this Order. The parties shall lodge the joint proposed Judgment with the Court on or before May 31, 2019. In the unlikely event that counsel are unable to agree upon a joint proposed Judgment, the parties shall each submit separate versions of a proposed Judgment along with a Joint Statement setting forth their respective positions no later than May 31, 2019.

IT IS SO ORDERED.